## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **R.K. et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:21-cv-00725** |
| | ) | |
| **GOVERNOR BILL LEE, in his official** | ) | |
| **capacity as GOVERNOR OF** | ) | |
| **TENNESSEE et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Pending before the Court is Plaintiffs' fully briefed Motion for Preliminary Injunction. (Doc. Nos. 4, 4-1, 34, 35, 39, 45, 52, 54-1[1], 59, 80, 81, 82, 83). Plaintiffs seek relief for themselves and a class of similarly situated disabled public-school students. Specifically, they request an order enjoining Governor Lee from enforcing Executive Order No. 84, which gives parents a unilateral right to opt their children out of temporary universal mask mandates imposed by the Williamson County Board of Education ("Williamson County") and the Franklin Special School District ("Franklin").[2] Plaintiffs allege that the Executive Order violates the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 *et seq.*, and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794.

---

[1] The Court granted leave for the Tennessee Chapter of the American Academy of Pediatrics and the American Academy of Pediatrics to file an Amicus Brief in Support of Plaintiffs' Motion for Preliminary Injunction. (See Doc. No. 65; see also Doc. Nos. 54, 54-1).

[2] The Court will refer to the schools together as "the Williamson County and Franklin school systems."

On September 24 and October 5, 2021, with notice to all parties, the Court issued a temporary injunction pending an evidentiary hearing on Plaintiffs' motion. (Doc. Nos. 30, 69). On October 5 and 13, 2021, the Court held an evidentiary hearing. At the hearing, the Court heard testimony from Dr. Sara Cross, Dr. Marilyn Augustyn, Dr. Jason Abaluck, Dr. Jay Bhattacharya, Ms. Rachel Suppé, and R.K.'s mother.[3] Dr. Cross, Dr. Augustyn, Dr. Abaluck, and R.K.'s mother testified on behalf of Plaintiffs. Dr. Bhattacharya and Ms. Suppé testified on behalf of Governor Lee. All parties filed post-hearing briefs. (Doc. Nos. 80, 81, 82, 83).

Having applied the credible evidence to the factors for issuance of a preliminary injunction, the Court finds all of the factors favor Plaintiffs. Pending trial, Governor Lee is enjoined from enforcing Executive Order No. 84, as extended by Executive Order No. 89, in Williamson County or allowing parents to opt out of either the Williamson County Board of Education or Franklin Special School System's mask mandates.

## I.    FINDINGS OF FACT[4]

### A.    Executive Order No. 84

On August 16, 2021, Governor Lee issued Executive Order No. 84, which states, in part, that "a student's parent or guardian shall have the right to opt out of any order or requirement for

---

[3]    For the reasons stated on the record at the preliminary injunction hearing, Dr. Cross, Dr. Augustyn, Dr. Abaluck, and Dr. Bhattacharya all satisfy the expert witness standards under Federal Rule of Evidence 702, and the Court will give weight to their testimony accordingly. See Fed. R. Evid. 702; see also United States v. Frazier, 442 F. Supp. 3d 1012, 1016 (M.D. Tenn. 2020); Norsworthy v. Beard, 87 F. Supp. 3d 1164, 1180–84 (N.D. Cal. 2015) (accepting medical expert's testimony under Rule 702 in ruling on a plaintiff's motion for injunctive relief).

[4]    The Court bases its factual findings on the credible and cogent evidence presented at the preliminary injunction hearing as well as the affidavits and declarations in the record. The Court has expanded on the preliminary findings made in its Memorandum Opinion and Order issuing temporary injunctive relief. (See Doc. No. 30). For the sake of clarity, the Court will recite some of those findings here, and, where applicable, expand those findings based on the enhanced record.

2

a student in kindergarten through twelfth-grade to wear a face covering at school, on a school bus, or at school functions, by affirmatively notifying in writing the local education agency or personnel at the student's school." <u>See</u> Exec. Order No. 84, State of Tennessee (August 16, 2021). There is no requirement that parents have a reason to opt out. (<u>Id.</u>). On September 30, 2021, Governor Lee extended the Executive Order through November 5, 2021 at 11:59 p.m. (<u>See</u> Doc. Nos. 50, 50-2).[5]

Plaintiffs are public-school students at high risk for severe COVID-19 infection due to their underlying health conditions. (Doc. No. 4-1 at 2, 4; <u>see also</u> Doc. Nos. 4-3 ¶ 7, 4-6 ¶¶ 13, 19; Doc. No. 82 at 2). They are seeking, as a "reasonable accommodation," unrestricted enforcement of the Williamson County and Franklin school systems' mask mandates to help protect themselves and other children who "are medically vulnerable to severe outcomes should they become infected with COVID-19." (<u>Id.</u> ¶ 12; <u>see also</u> Doc. No. 4-3 ¶ 13; Doc. No. 82 at 2). Plaintiffs also seek protection against discrimination under the ADA and Section 504. (Doc. No. 4-1 at 10; <u>see also</u> Doc. No. 82 at 1).

Plaintiff R.K. is a 13-year-old seventh grader in Williamson County with Down syndrome. (Doc. No. 4-1 at 5; <u>see also</u> Doc. Nos. 1 ¶ 12, 4-3 ¶ 2). R.K.'s mother is a board-certified physician in both allergy and immunology. (Hr'g Tr., Doc. No. 77 at 13:6–7). She also treats children who are infected with COVID-19. (<u>Id.</u> at 13:24–14:14). The Court finds R.K.'s mother highly knowledgeable and credible on the subjects of COVID-19, its effect on disabled children, and mitigation efforts. R.K.'s mother persuasively testified that R.K. is "four times more likely to be hospitalized and ten times more likely to die as a result [COVID-19] as compared with the general population." (Doc. No. 4-3 ¶ 3; <u>see also</u> Hr'g Tr., Doc. No. 77 49:13–51:7; Hr'g Ex. 3).

---

[5]     For the sake of consistency, the Court will refer to Governor Lee's Order as Executive Order No. 84 rather than Executive Order No. 89, which extended the original Executive Order No. 84 through November 5, 2021. (<u>See</u> Doc. Nos. 50, 50-2).

Concerned about the rising number of COVID-19 cases in Williamson County, R.K.'s mother kept R.K. home from school to keep her "safe at a time when the number of cases were skyrocketing." (Hr'g Tr., Doc. No. 77 at 31:14–20). Although R.K. has now been attending classes in person, her mother remains concerned about her health due to the large percentage of unmasked students and staff. (See Doc. No. 4-3 ¶ 10). R.K.'s mother credibly testified that even if her daughter wears a mask, she "is not fully protected from others spreading the virus to her, in particular if the others are not wearing masks in high percentages." (Hr'g Tr., Doc. No. 77 at 21:24–22:5). R.K.'s mother has therefore "instructed R.K.'s teachers to help [R.K.] keep her distance as best as possible so as to try to lessen the risk that her teachers might spread COVID-19 to her as they also have a high mask opt-out rate." (Id. ¶ 12). But these requests, she says, "do nothing to mitigate the true danger that [R.K.] is in [because of] the number of unmasked students, teachers, and staff at her school." (Id.).

R.K.'s mother also credibly testified that virtual schooling options, if offered by Williamson County, would not be a healthy alternative for R.K. According to R.K.'s mother, R.K. "really struggled emotionally" and "lost all of her typical friends" when attending school online during the 2020 school year. (Hr'g Tr., Doc. No. 77 at 40:21–24). Because R.K. struggled with her happiness and overall emotional well-being, R.K.'s mother returned R.K. to school in person toward the end of the 2020-2021 school year. (Id. at 21:6–10). She did so because Williamson County had imposed a temporary universal mask mandate that, in conjunction with other mitigation measures, had been effective in keeping COVID-19 cases low within the school. (Id. at 21:11–13). After R.K.'s mother allowed R.K. to attend school in-person, however, she learned that Williamson County amended its mask mandate to comply with Executive Order No. 84, and that the school was therefore "not going to continue the same level of precautions that they had the

4

prior year." (Id. at 21:15–19). R.K.'s mother believes that Executive Order No. 84 violates R.K.'s "right to be safe and her right to health in a public-school setting," (Id. at 26:17–18), because more students do not wear masks.

Plaintiff W.S. is a seven-year-old second grader at Franklin with type-1 diabetes. (Doc. No. 4-1 at 6; see also Doc. Nos. 4-4 ¶¶ 2–3, 70-1 at 9:18–20). According to W.S.'s mother, W.S. was infected with COVID-19 at school due to inadequate mask wearing compounded by Executive Order No. 84. (See Doc. No. 4-4 ¶ 8; see also Doc. No. 70-1 at 22:25–23:3). W.S.'s infection "required 14 straight intensive hours of effort and consultation with her treating physician to regulate her blood sugar levels back to a normal range." (Doc. No. 1 ¶ 13; see also Doc. No. 4-4 ¶¶ 7–9; Doc. No. 70-1 at 27:22–28:1). W.S. is not old enough to be vaccinated, and her mother believes that many of W.S.'s classmates have opted out of wearing masks. (Doc. No. 4-4 ¶¶ 7, 10). W.S.'s mother remains concerned "that [W.S.] may be reinfected if her school does not universally require masks for all students and teachers." (Id.; see also Doc. No. 70-1 at 32:7–13).

B. COVID-19 in Children with Underlying Health Conditions

Those with underlying health conditions, including children such as R.K. and W.S., are at an increased risk for severe infection, hospitalization, or death from COVID-19. (Doc. No. 4-6 ¶ 13; see also Hr'g Tr., Doc. No. 77 at 38:4–6, 50:17–18). The Centers for Disease Control (CDC) has found that "children with medical complexity, with genetic, neurologic, metabolic conditions, or with congenital heart disease can be at increased risk for severe illness from COVID-19." CDC, COVID-19: People with Certain Medical Conditions (May 13, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precauations/people-with-medical-conditions.html. "[C]hildren with obesity, diabetes, asthma or chronic lung disease, sickle cell

5

disease, or immunosuppression can also be at increased risk for severe illness from COVID-19." Id.; (see also Doc. Nos. 4-5, 4-6).

Plaintiffs presented strong and persuasive expert testimony regarding the adverse effect of COVID-19 on children with underlying health conditions. Dr. Cross is a board-certified infectious disease physician who practices at Regional One Health in Memphis. (Hr'g Tr., Doc. No. 77 at 73:8–13; 76:10–12). She also was appointed by Governor Lee to the Tennessee Coronavirus Task Force. (Id. at 77:9–14). Dr. Cross, R.K.'s mother, and Dr. Elizabeth Williams,[6] in a sworn statement, confirmed the heightened risk to disabled students. These experts noted that "at least one" child with a preexisting condition placing them at a heightened risk for serious COVID-19 infection "is present in nearly every classroom in Williamson County." (Doc. No. 4-6 ¶ 16; see also Hr'g Tr., Doc. No. 77 at 25:1–10).

Experts also remarked that the spread of the Delta variant, which is twice as contagious as prior variants, poses an especially foreboding threat to children with underlying conditions. (Doc. Nos. 4-5 ¶ 8, 4-6 ¶ 6; see also Hr'g Tr., Doc. No. 77 at 87:3–8). Dr. Cross and R.K.'s mother agree that the Delta variant is more contagious than prior variants and "causes more severe disease." (Hr'g Tr., Doc. No. 77 at 26:22–27:1; 87:3–8, 12–13; see also Doc. No. 4-6 ¶ 19). Recently, children accounted for 36% of all COVID-19 cases in Tennessee. (Doc. No. 4-1 at 5). And case counts continue to remain high in Williamson County. (Doc. Nos. 4-3 ¶ 9, 4-6 ¶ 6). Williamson County schools had dozens of staff members and more than one hundred students in isolation with a confirmed positive case of COVID-19 every week from September 3, 2021 through October 8,

---

[6]     Plaintiffs provided a sworn declaration from Dr. Elizabeth Williams. (See Doc. No. 4-6). Plaintiffs did not seek to qualify Dr. Williams as an expert at the preliminary injunction hearing even though it appears that she would qualify under Federal Rule of Evidence 702. See Fed. R. Evid. 702.

2021. See Williamson County Schools, COVID-19 Numbers 2021-22 (October 8, 2021), https://www.wcs.edu/Page/8641.

C. Masks as an Effective Mitigation Measure

It is hard to find a corner of American society that has not been impacted by COVID-19 since March 2020, and schools are no exception. According to the Centers for Disease Control ("CDC") the virus' ubiquity is due, in part, to the ease with which it spreads when people cough, sneeze, or even talk. See CDC, Scientific Brief: SARS-CoV-2 Transmission (May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html; (see also Doc. Nos. 4-5 ¶ 11, 4-6 ¶ 8). Because of the ease with which the virus spreads, the American Academy of Pediatrics strongly recommends "universal masking for students, teachers, and support staff . . . because masks are a safe, effective, and critical infection control measure." (Doc. No. 54-1 at 6; see also id. at 7 (citing CDC, Science Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2, (May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/masking-science-sars-cov2.html)).

The CDC has found that masks are effective in reducing the spread of COVID-19. (See Doc. No. 4-6 ¶ 25 (citing D.K. Chu et al., Physical distancing, face masks, and eye protection to prevent person-to-person transmission of SARS-CoV-2 and COVID-19: A systematic review and meta-analysis. 395 THE LANCET 1973–87 (2020)); see also CDC, Science Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2 (May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/masking-science-sars-cov2.html).

7

Health experts and school officials in Tennessee agree that masks are effective. (See Doc. No. 4-5 ¶¶ 12–17). R.K.'s mother credibly testified that masking is "readily available," "highly effective," and "the easiest prevention strategy" for schools to implement. (Hr'g Tr., Doc. No. 77 at 18:19–20). Dr. Cross similarly testified that "[b]ased on [her] extensive research . . . masks are the most effective method of preventing transmission of" COVID-19. (Id. at 79:10–12; see also id. at 115:1–3). Dr. Cross relies upon several studies, including one case where two symptomatic hairstylists, who were infected with COVID-19 but were wearing masks, closely interacted with 139 clients for an average of fifteen minutes. (Id. at 85:1–7; see also Hr'g Ex. 8). Dr. Cross noted that researchers interviewed 67 clients following exposure and found that "none of them developed infection." (Id. at 85:6–11). Dr. Cross also references another study that analyzed the effect of masks on COVID-related mortality. (Id. at 82:1–17; see also Hr'g Ex. 6). In that study, researchers found "that countries experiencing low mortality adopted . . . mask mandates very early in the pandemic." (Id. at 82:9–11). Researchers then compared these countries to ones without mask mandates and found a 48.3% variance in mortality. (Id. at 82:15–16). According to Dr. Cross, "[t]he only thing that these countries [with lower mortality rates] did was implement a mask mandate early." (Id. at 82:16–17; see also Hr'g Ex. 7 (similarly concluding that mask mandates were effective in reducing COVID-19)).

Plaintiffs offered additional compelling expert testimony on the effectiveness of masks by Dr. Marilyn Augustyn and Dr. Jason Abaluck. Dr. Augustyn is a board-certified physician in both pediatrics as well as developmental and behavioral pediatrics at the Boston University School of Medicine. (Id. at 124:7–19; see also Doc. No. 59-3). Dr. Jason Abaluck is an econometrician and Professor at the Yale University School of Management. (Hr'g Tr., Doc. No. 77 at 181:1–12). He is also the lead author of a study on COVID-19 and mask-use, The Impact of Community Masking

on COVID-19: A Cluster-Randomized Trial in Bangladesh. (Id. at 181:20–25; see also Hr'g Ex. 23) (hereinafter "the Bangladesh study").

As with Dr. Cross and R.K.'s mother, Dr. Augustyn and Dr. Abaluck logically and effectively explained that masks were effective as a mitigation measure. Dr. Augustyn agreed that "[t]o avoid further closure of schools with deleterious consequences, mask wearing by children is necessary." (Hr'g Tr., Doc. No. 77 at 173:1–3 (quoting Hr'g Ex. 16)). She did so based on her expertise in developmental pediatrics, even after weighing the potential effect of masks on a child's development. (Id. at 130:15–131:1). Dr. Augustyn testified that masks do not meaningfully inhibit pediatric developmental processes. (Id.). Dr. Abaluck stated that masks had a statistically significant effect on reducing symptomatic COVID-19 infection. (Id. at 201:1–5). In making this conclusion, Dr. Abaluck relied on his Bangladesh study. (Id. at 181:20–25; see also Hr'g Ex. 23). Dr. Abaluck and his team designed the study as a "cluster-randomized trial," in which they took 600 villages and "randomized 300 of those villages to receive an intensive treatment designed to increase masking in order to potentially protect them against COVID." (Hr'g Tr., Doc. No. 77 at 182:25–183:5). The study concluded that, for villages where mask use increased by around 30%, COVID rates "fell by about 9 percent in the treatment group." (Id. at 191:23; see also id. at 191:16–22). Overall, the Court was impressed with the expert testimony of Dr. Cross, Dr. Augustyn, and Dr. Abaluck as to the efficacy of masks in reducing the spread of COVID-19. (See Doc. Nos. 4-6 ¶¶ 25, 28; 54-1 at 6–9; Hr'g Tr., Doc. No. 77 at 26:14–27:24; 141:17–23; 191:9–23).

Indeed, even Governor Lee has admitted that "[i]f you want to protect your kid from the [COVID-19] virus or from quarantine, the best way to do that is to have your kid in school with a mask." Kimberlee Kruesi, Health Chief: Children now 36% of Tennessee's virus cases, AP NEWS (Aug. 25, 2021), https://apnews.com/article/health-coronavirus-pandemic-tennessee-

32b7ff0dc540a2b11cc8c736c67020fe#:~:text=Mark%20Humphrey%2C%20File)-

,NASHVILLE%2C%20Tenn.,Commissioner%20Lisa%20Piercey%20said%20Wednesday.

The Tennessee Department of Education agrees, noting that masking is a "[p]roven mitigation" strategy and is "effective" in controlling "the spread of COVID-19." Tenn. Dept. of Ed., FAQs related to COVID-19's Effect on Tennessee Schools (Sept. 7, 2021), https://www.tn.gov/content/dam/tn/education/health-&-safety/FAQs%20for%20COVID-19%20Effect%20on%20Schools.pdf; (see also Hr'g Ex. 28). Ms. Rachel Suppé, Deputy General Counsel at the Tennessee Department of Education, testified on behalf of Governor Lee that she had no reason to doubt the effectiveness of masks in schools as a mitigation measure. (Oct. 13 Hr'g Tr. at 92:11–21; 115:18–21). And according to Dr. Cross, who was appointed by Governor Lee to Tennessee's Coronavirus Task Force, "the failure to implement a universal masking policy in schools will likely lead to extremely high rates of transmission of COVID-19 in the classroom setting." (Doc. No. 4-5 ¶¶ 4, 20; see also Hr'g Tr., Doc. No. 77 at 105:2–6).

Oddly, Governor Lee offered the expert testimony of Dr. Jay Bhattacharya for the opposite conclusion: that masks were not effective in reducing the spread of COVID-19 and that schoolchildren are not at high risk for infection. Dr. Bhattacharya is a professor of health policy at Stanford Medical School. (Oct. 13 Hr'g Tr. at 3:24–4:2). He opined that "the medical and epidemiological literature" shows that: (1) children are at low risk of death from COVID-19; (2) "children are less efficient at spreading the disease to adults than adults are at spreading the infection to children or each other"; (3) "there is no high-quality evidence that requiring children to wear masks has any appreciable effect on the likelihood that teachers or other school staff will acquire COVID-19 disease"; and (4) that wearing masks causes harm to a child's learning and

10

development. (Doc. No. 42 ¶ 80; <u>see also</u> Doc. No. 68-1 57:2–25; 66:11–67:5; Oct. 13 Hr'g Tr. 13:20–14:3; 18:22–19:5; 20:16–22; 22:16–23).

Dr. Bhattacharya relied upon Dr. Abaluck's Bangladesh study to conclude that masks were ineffective. (Doc. No. 42 ¶ 59; <u>see also</u> Doc. No. 68-1 33:23–35:24; Hr'g Ex. 23). Dr. Bhattacharya believes that Dr. Abaluck's study shows "no statistically significant difference in the symptomatic seroprevalence of COVID-19 disease in the villages with cloth masks and the control villages." (Oct. 13 Hr'g Tr. at 29:4–11; <u>see also</u> Doc. No. 42 ¶ 59). According to Dr. Bhattacharya, "[t]he villages assigned control masks had a slightly lower symptomatic seroprevalence rate than the control villages (0.76% vs. 0.69%), with a statistical confidence bound that included zero effect and no measured difference in hospitalization or mortality." (Doc. No. 42 ¶ 59).

However, Dr. Bhattacharya's expert testimony is troubling and problematic for several reasons. First, Dr. Bhattacharya's conclusions conflicted with those of the study's lead author and designer, Dr. Abaluck. He cogently testified that the study comes to the opposite conclusion to what Dr. Bhattacharya opines. According to Dr. Abaluck, the Bangladesh study was specifically designed to examine the effect of masks on COVID-19 rates. The study found that when masks use increased by approximately 30%, "rates of COVID fell by about 9 percent." (Hr'g Tr., Doc. No. 77 at 191:10–15). To Dr. Abaluck and his team, this result shows that masks had a statistically significant effect on reducing symptomatic COVID-19 infection. (<u>Id.</u> at 201:1–5). Importantly, Dr. Bhattacharya failed to credibly address this finding. Further, Dr. Abaluck's testimony is consistent with that of other experts, who credibly testified that masks reduce the spread of COVID-19. (<u>See</u> Hr'g Tr., Doc. No. 77 at 26:14–27:24; 141:17–23; 191:9–23).

Second, Dr. Bhattacharya is not qualified to make several of his conclusions. He conceded that he does not practice medicine, is not board-certified in any medical field, and did not complete

an infectious disease residency. (Doc. No. 68-1 at 13:6–14). Nevertheless, Dr. Bhattacharya purported to comment on a child's risk of spreading infection or dying from COVID-19. (See Oct. 13 Hr'g Tr. 13:20–14:3; 18:22–19:5; 20:16–22; 22:16–23).

Third, Dr. Bhattacharya's testimony is replete with contradictions that undercut his credibility. For example, Dr. Bhattacharya claimed that, "[g]enerally in scholarship . . . you never say proof of a negative." (Doc. No. 68-1 at 24:8–18). Dr. Bhattacharya stressed that the absence of evidence is not the same as claiming evidence has "no impact." (Id.). Yet, his opinions regarding the Bangladesh study clearly violate this scholarly principle. Dr. Bhattacharya concluded there was "no measured difference in hospitalization or mortality." (Doc. No. 42 ¶ 59; see also Oct. 13 Hr'g Tr. at 70:17–71:2). But Dr. Abaluck credibly explained that the study, in fact, did not examine hospitalization or mortality because such data does not exist. (Hr'g Tr., Doc. No. 77 at 212:22–213:7). Dr. Abaluck believes that Dr. Bhattacharya's use of the term "no measured difference" was "designed to deliberately mislead readers into thinking that we tested whether there were differences in hospitalizations or mortality, when in fact we could not conduct that test because we could not get this data. He worded this statement in a way that seems designed to mislead." (Id. at 213:9–13). The Court need not determine whether this is true or not because, at the very least, it gives the Court great hesitation to give significant weight to Dr. Bhattacharya's opinion.

In its amicus brief, the AAP highlighted additional inconsistencies by Dr. Bhattacharya that trouble the Court. (See Doc. No. 54-1). The AAP suggests that many of the studies relied upon by Dr. Bhattacharya occurred "prior to the rise of the Delta variant . . . and at a time when children were frequently not tested due to testing shortages and the perception that asymptomatic or minimally symptomatic individuals were at low risk for transmission or serious consequences." (Id. at 10–11). The AAP also points out that Dr. Bhattacharya conveniently fails to cite to evidence

establishing that "the absence of randomized controlled trials undermines the value of evidence" supporting masking in schools due to COVID-19. (Id. at 11). The AAP echoes Dr. Abaluck's conclusion that Dr. Bhattacharya substantially misrepresents the findings of the Bangladesh study. (Id.).

Finally, Dr. Bhattacharya's expert testimony regarding the effect of masks on pediatric development also gives the Court great hesitation about relying on his opinion. Dr. Bhattacharya opined that there "is ample evidence of some physical and developmental harms to children that accrue from wearing masks." (Doc. No. 42 ¶ 73). To support this conclusion, he relied on a survey of parents and pediatricians finding that "a substantial fraction of children required to wear masks experience immediate physical side-effects, including speaking difficulties, changes in mood, discomfort breathing, headache, and cutaneous disorders (i.e., face rashes)." (Id. ¶ 75 (citing Assathiany R. et al., Face Masks in Young Children During the COVID-19 Pandemic: Parents' and Pediatricians' Point of View. Front Pediatr. 2021 Jun. 23;9:676718.doi: 10.3389/fped.2021.676718. PMID: 34249814; PMCID: PMC8260829)). But substantial record evidence runs counter to these conclusions. For example, Dr. Augustyn credibly questioned whether the parental survey on which Dr. Bhattacharya relied contained weak, convenient samples. (Hr'g Tr., Doc. No. 77 at 137:13–25). And the AAP similarly suggests that Dr. Bhattacharya unreliably utilizes observational evidence, such as the parental survey study, ignores substantial peer-reviewed evidence, and instead "highlights two non-peer-reviewed analyses that support his preexisting hypothesis." (Doc. No. 54-1 at 12, 15).

In short, the Court is not persuaded by, or confident in, Dr. Bhattacharya's expert opinion. He oversimplified the conclusions of the Bangladesh study, suggesting he may have been apt to do so with other studies upon which he relied. He offered opinions regarding the pediatric effects

13

of masks on children, a discipline on which he admitted he was not qualified to speak. (See Doc. No. 115 at 3–7; see also Oct. 13 Hr'g Tr. at 45:15–46:3). His demeanor and tone while testifying suggest that he is advancing a personal agenda. At this stage of the proceedings, the Court is simply unwilling to trust Dr. Bhattacharya.

D.  Mask Mandates in the Williamson County and Franklin School Systems Before and After Executive Order No. 84

The Williamson County and Franklin school systems each imposed universal mask mandates early in the COVID-19 pandemic, including during the 2020-2021 school year. (See Golden Aff., Doc. No. 37 ¶ 3; see also Doc. No. 80 at 5). The mandates "required masks to be worn by students, staff, and visitors at all grade levels inside all buildings and on buses." (Id.; see also Doc. No. 80 at 5).

For the 2021-2022 school year, recognizing that their schools were reaching a "crisis point" due to the rapid spread of new COVID-19 cases, both school systems renewed implementation of universal mask mandates for all students, staff, and visitors, except for those who have a medical condition or sincerely held religious belief. (See Doc. Nos. 1-1, 23, 24, 26, 27, 36, 37, 80 at 5). When they did so, their focus was on returning children to in-person education amidst an ongoing, historic, and deadly pandemic. Franklin based its 2021-2022 mandate on several objective, science-based, and "important factors," including: (1) the quadrupling of new COVID cases in Franklin students and staff between Week 1 and Week 2; (2) that children 11 and younger remain ineligible for a COVID-19 vaccine; (3) according to the CDC, Williamson County has been in the "high range for community transmission since July 22,"; and (4) the Delta variant "spreads more easily than previous variants, and can be spread by vaccinated individuals." See Franklin Special School District, Messages from the Director (August 20, 2021), https://www.fssd.org/about-us/fssd-together-2021#fs-panel-13348.

14

On September 20, 2021, recognizing the continued threat of COVID-19 and the rise of the Delta variant, each school system extended their respective mask mandates until at least mid-January 2022. (Doc. Nos. 23, 24, 26, 27, 36, 37, 80 at 5). In extending its temporary universal mask mandate, Williamson County noted that "COVID numbers in the schools had declined since the mandate was implemented, and a majority of the Board determined that continuation of the mandate through the end of the semester would be the best approach and would limit disruption to school operations." (Doc. No. 23 at 1–2). Similarly, Franklin noted that "[u]niversal masking, in conjunction with other mitigation strategies, remains the best way to ensure a safe learning environment for all children." (Doc. No. 26 at 2).

Following Governor Lee's Executive Order, however, both Williamson County and Franklin amended their temporary universal mask policies to allow for voluntary parental opt-out. (Doc. Nos. 23, 24, 26, 27). Williamson County school officials noted that the Governor's Order turned their existing temporary universal mask mandate into a "Swiss cheese model." (Doc. No. 59 at 3 (citing WCBOE hearing on Sept. 20, 2021, available at https://www.youtube.com/watch?v=t3mB3jcxTws (last visited Oct. 15, 2021))). After the schools amended their mask mandates to comply with Governor Lee's order, as many as 13,231 children— nearly 32% of the student body—opted out of Williamson County's amended masking policy. Williamson County Schools, COVID-19 Numbers 2021-22 (September 10, 2021), https://www.wcs.edu/Page/8598. Approximately 200 Franklin students, or 10% of the student body, similarly opted out.[7]

---

[7]     Although Franklin has not published its opt-out rates, the school's counsel confirmed this figure on the record in open court on September 20, 2021. (<u>See</u> Doc. No. 18).

## II.    LEGAL STANDARD

"The purpose of a preliminary injunction is to preserve the status quo until a trial on the merits." Southern Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co., 860 F.3d 844, 848 (6th Cir. 2017) (citing Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981)). However, "a preliminary injunction is an extraordinary and drastic remedy," which should "only be awarded upon a clear showing that the plaintiff is entitled to such relief." Id. (internal citations and quotations omitted); see also Munaf v. Geren, 553 U.S. 674, 689–90 (2008); Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008).

In order to determine whether to issue a preliminary injunction under Rule 65, federal courts must consider the following four factors: "(1) whether the moving party has shown a likelihood of success on the merits; (2) whether the moving party will be irreparably injured absent an injunction; (3) whether issuing an injunction will harm other parties to the litigation; and (4) whether an injunction is in the public interest." Vitolo v. Guzman, 999 F.3d 353, 360 (6th Cir. 2021) (citing Nken v. Holder, 556 U.S. 418 (2009)); "These factors are not prerequisites but are factors that are to be balanced against each other." Jones v. Caruso, 569 F.3d 258, 265 (6th Cir. 2009).

## III.    CONCLUSIONS OF LAW

Having considered the entire record, and relying on the credible evidence, the Court concludes that each of the required, traditional preliminary injunction factors favor Plaintiffs. The Court will discuss each factor in turn.[8]

---

[8]    Governor Lee appears to have abandoned his argument that the doctrine of laches bars Plaintiffs from relief. (See Doc. No. 16 at 5–7); see also Rose v. Delta Airlines, Inc., No. 15-13567, 2016 U.S. Dist. LEXIS 44423, at *17–18 (E.D. Mich. Apr. 1, 2016) (discussing abandonment in the context of an ADA and Section 504 case). Even had Governor Lee maintained such an argument, it would be unsuccessful. For the reasons stated in the Court's prior opinion issuing

16

A. Standing

As an initial matter, Governor Lee argues that Plaintiffs have no standing to challenge Executive Order No. 84. (Doc. No. 45 at 9; see also Doc. No. 83 at 3–5). Under the Constitution, judicial power "extends only to 'Cases' and 'Controversies.'" Spokeo v. Robins, 136 S. Ct. 1540, 1547 (2016) (quoting U.S. Const. Art. III, § 2). Thus, the concept of "[s]tanding 'ensure[s] that federal courts do not exceed their authority' and 'limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong.'" Tenn. v. United States Dep't of State, 931 F.3d 499, 507 (6th Cir. 2019) (quoting Spokeo, 136 S. Ct. at 1547).

To establish standing, a plaintiff must show: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180–81 (2000)). Governor Lee challenges prongs one and two of the requisite standing inquiry.

First, the Governor argues that Plaintiffs' alleged injury is too conjectural to constitute an injury in fact because it is impossible to "wholly eliminate the risk" of COVID-19 infection. (Doc. No. 45 at 4–5 (citing Cross Dep., Doc. No. 39-2, at 19:20–20:8, 31:15–23); see also Doc. No. 83 at 3–4). The Governor suggests that, because COVID-19 is so pervasive, the real issue is whether Plaintiffs can identify a connection between positive COVID-19 case counts and Executive Order No. 84 itself. (See Doc. No. 45 at 6). Governor Lee also argues that, in light of falling COVID-19

---

temporary injunctive relief, Governor Lee cannot establish either: (1) lack of diligence by Plaintiffs in bringing suit, or (2) prejudice. (See Doc. No. 30 at 13–14 (citing Kehoe v. Component Sales Inc. v. Best Lighting Prods., 796 F.3d 576, 585 (6th Cir. 2015)); see also State ex rel. Elvis Presley Intern. Memorial Foundation v. Crowell, 733 S.W.2d 89, 101 (Tenn. Ct. App. 1987) (reciting the same elements)).

17

case counts, the "risks associated with COVID cases in [Williamson] County have lessened substantially, including before there was any masking requirement. (Doc. No. 83 at 4–5).

But the Governor's arguments overlook that "[s]tanding can derive from imminent, rather than actual injury" when "the threatened injury is real, immediate, and direct." Crawford v. United States Dep't of the Treasury, 868 F.3d 438, 454 (6th Cir. 2017) (quoting Davis v. FEC, 554 U.S. 724, 734 (2008)). Here, Plaintiffs correctly argue that their risk of contracting potentially life-threatening COVID-19 is sufficiently imminent, regardless of when the risk "materializes," because of the "Swiss cheese effect" created by Executive Order No. 84. (Doc. No. 59 at 4–5). The record before the Court establishes that the imminent threat of COVID-19 is "real, immediate, and direct" in Plaintiffs' schools in light of Executive Order No. 84. Crawford, 868 F.3d at 454. After Governor Lee implemented the order, nearly one in every three children opted out of Williamson County's amended masking policy. Williamson County Schools, COVID-19 Numbers 2021-22 (September 10, 2021), https://www.wcs.edu/Page/8598. Approximately one in every ten Franklin students similarly opted out.

Tellingly, Dr. Cross and R.K.'s mother, in her role as an expert in immunology, agreed that: (1) it is likely at least one high-risk, disabled student exists in every classroom in Williamson County; and (2) an increase in unmasked students, brought about by Executive Order No. 84, would likely contribute to an increase in COVID-19 cases. (See Hr'g Tr., Doc. No. 77, at 25:1–10; see also Doc. No. 4-5 ¶¶ 4, 20). The potential for increased infection is therefore real. Indeed, case rates are still at serious levels in Williamson County, as dozens of staff members and more than one hundred students have been in isolation with a confirmed positive case of COVID-19 every week from September 3, 2021 through October 8, 2021. See Williamson County Schools,

18

COVID-19 Numbers 2021-22 (October 8, 2021), https://www.wcs.edu/Page/8641. Accordingly, the Court finds that Plaintiffs have established a sufficiently imminent injury in fact.

Second, Governor Lee argues that Plaintiffs' alleged injury is not fairly traceable to Executive Order No. 84. (Doc. No. 45 at 6; see also Doc. No. 83 at 4). Specifically, the Governor argues that Plaintiffs cannot prove a causal relationship between the number of unmasked children and Governor Lee's order. (Doc. No. 83 at 6). Rather, he argues that "[m]ultiple contingencies with independent actors preclude any alleged injury from being traceable to" Executive Order No. 84. (Id.). The Governor highlights one such contingency: that students who opted out due to the Executive Order would have to independently choose to attend school in order to expose Plaintiffs to COVID-19. (Doc. No. 45 at 7). He concludes that students with COVID are likely staying home and thus not infecting other students. (Id.).

Once again, well-settled legal precedent controls and cuts against the Governor's arguments. It has long been true that traceability "is not synonymous with causation sufficient to support a claim." Parsons v. United States Dep't of Justice, 801 F.3d 701, 715 (6th Cir. 2015). Plaintiffs need not show that Executive Order No. 84 legally caused their alleged injuries; rather, they need only show that their injuries are "fairly traceable." See Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 133 (2014); see also Spokeo, 136 S. Ct. at 1547. The credible evidence proves that unmasked, asymptomatic individuals can carry and transmit COVID-19. (See Hr'g Tr., Doc. No. 77 at 183:6–12). There is no reason to believe that asymptomatic students who have COVID would stay home from school, let alone know they are infected in the first place. (See id.).

Two Tennessee federal courts have reached the same conclusion based upon sound rationale. Those courts have found that that, for purposes of standing, disabled schoolchildren with

19

underlying, high-risk medical conditions have a sufficiently imminent injury that was fairly traceable to Governor Lee's Executive Order No. 84. See S.B. v. Lee, __ F. Supp. 3d __, 2021 WL 4755619, at *7–8 (E.D. Tenn. Oct. 12, 2021); G.S. v. Lee, __ F. Supp. 3d __, 2021 WL 4268285, at *8 (W.D. Tenn. Sept. 3, 2021). Facing a similar challenge to Executive Order No. 84 in the Eastern District of Tennessee, for example, Governor Lee argued that disabled students could not establish standing because the lack of a universal mask mandate in the Knox County Public Schools was not "fairly traceable" to the executive order. S.B., 2021 WL 4755619, at *8. Judge Greer rejected the Governor's argument because "[t]he record—from the pleadings, to the parties' briefs, to the evidentiary hearing—therefore smacks of an injury traceable to Governor Lee's executive order because it shows that the executive order foreclosed the Knox County Board of Education from adopting a mask mandate, the alleged reasonable accommodation that Plaintiffs request under the ADA." Id.; see also G.S., 2021 WL 4268285, at *9 (likewise finding that disabled students demonstrated their alleged harm was fairly traceable to Executive Order No. 84 because the order "was the catalyst for [schools] to be unable to" impose mask requirements to protect disabled students).

Here, the record compels the same conclusion. The Williamson County and Franklin school systems have conceded that Executive Order No. 84 severely limits the accommodations they are able to provide for their students. (See Doc. Nos. 80 at 5; 81 at 3–4). This is at least compelling circumstantial evidence, if not direct evidence, that Executive Order No. 84 is fairly traceable to Plaintiffs' alleged harm. Whereas in S.B., plaintiffs alleged that the executive order hypothetically precluded the Knox County schools from implementing a universal mask mandate in the first place, Plaintiffs here argue that Executive Order No. 84 limits mask mandates that *already exist.* Indeed, neither Williamson County nor Franklin opposed the Court's issuance of

temporary injunctive relief. (See Doc. No. 30 at 7; see also Doc. Nos. 15, 26). Nor do the schools challenge Plaintiffs' request for continued injunctive relief, as such relief would "be entirely consistent with the policy" already adopted by the schools. (Doc. No. 81 at 3; see also Doc. No. 80 at 5). That Williamson County and Franklin schools repeatedly admit that Executive Order No. 84 impedes their ability to fully enforce the mask mandates they have adopted since the beginning of the pandemic is itself enough for the Court to find that Plaintiffs' alleged harm is fairly traceable to Executive Order No. 84.

Accordingly, the Court finds that Plaintiffs have sufficiently established that their alleged injury is fairly traceable to Executive Order No. 84. Plaintiffs have therefore satisfied the "irreducible constitutional minimum of standing." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).

B.  Likelihood of Success on the Merits

The Court turns now to Plaintiffs' likelihood of success on the merits. The United States Constitution enshrines the principle that federal law is "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Courts have consistently found that this clause of the Constitution, better known as the Supremacy Clause, "supplies an important 'rule of decision,' which instructs that courts 'must not give effect to state laws that conflict with federal laws.'" Torres v. Precision Industries, Inc., 938 F.3d 752, 754 (6th Cir. 2019) (citing Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 324 (2015)). Thus, where a state law interferes with federal law, it is invalid. Here, Plaintiffs argue that Executive Order No. 84 violates federal law, namely the ADA and Section 504 of the Rehabilitation Act. (See Doc. No. 4-1 at 10–11). The Court agrees that there is a high and substantial likelihood that Plaintiffs will prevail on their claims under the ADA and Section 504.

21

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; see also Wilson v. Gregory, 3 F.4th 844, 859 (6th Cir. 2021). Section 504 similarly provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .." 29 U.S.C. § 794(a). In the Sixth Circuit, claims brought under the ADA and Section 504 "share the same substantive standard," and Courts review each as if brought under the ADA. Zibbell v. Mich. Dep't of Human Servs., 313 F. App'x 843, 849 (6th Cir. 2009).

Plaintiffs argue that Executive Order No. 84 and the resulting amended, weakened mask policies "have nullified the rights of students with disabilities to enjoy safe, fundamental, and non-discriminatory access to their public institutions." (Doc. No. 4-1 at 3). As a result, Plaintiffs argue that they are likely to succeed on the merits of their failure to accommodate claim because: (1) under the ADA and Section 504, they are qualified individuals with disabilities who are entitled to reasonable accommodations and protections from unlawful discrimination; and (2) Executive Order No. 84 denies them their federal right and opportunity to participate in and access the educational services of their public-school districts guaranteed under the ADA and Section 504. (Id. at 10–11).

To establish a failure to accommodate claim, Plaintiffs must show that: "(1) [they are] disabled; (2) [they were] 'qualified' to take part in the 'services, programs, or activities' of the public entity; (3) [they were] 'excluded from participation in' or 'denied the benefits of' such 'services, programs, or activities'; and (4) this exclusion or denial occurred 'by reason of' [their]

22

disability." Keller v. Chippewa Cty., Michigan Bd. of Commissioners, No. 20-2086, __ F. App'x __, 2021 WL 2411873, at *4 (6th Cir. June 14, 2021) (citing 42 U.S.C. § 12132); see also Ability Ctr. of Greater Toledo, 385 F.3d 901, 909–10 (6th Cir. 2004). The Court will examine each element.

Governor Lee does not contest the first two elements of a failure to accommodate claim. Even if he did, there is sufficient evidence that Plaintiffs satisfy these elements. First, Plaintiffs have medical conditions that render them disabled under the ADA. See 42 U.S.C. § 12102(1)(A) (defining "disability" as "a physical or mental impairment that substantially limits one or more major life activities"). And second, because Plaintiffs are public school students in either the Williamson County or Franklin school systems, they are "qualified to take part in their respective school's 'services, programs, or activities.'" G.S., 2021 WL 4268285, at *5 (citing 42 U.S.C. § 12102 and Moorer v. Baptist Memorial Health Care Sys., 398 F.3d 469, 479 (6th Cir. 2005)); see also ARC of Iowa v. Reynolds, __ F. Supp. 3d __, 2021 WL 4166728, at *10 (S.D. Iowa Sept. 13, 2021) (finding that, because plaintiffs were students, they were "thus entitled to participate in the programs, services, and activities of their schools").

Instead, Governor Lee challenges the third and fourth elements of a failure to accommodate claim: whether Plaintiffs were excluded from the programs, services, and activities of their schools because of their disability. See Keller, 2021 WL 2411873, at *4; (see also Doc. No. 16 at 12). Again, the Court concludes that Plaintiffs satisfy these elements.

   1. Exclusion from School Programs

Title II of the ADA focuses on "access to services, programs, and activities." Babcock v. Michigan, 812 F.3d 531, 535 (6th Cir. 2016). To determine whether Plaintiffs have been excluded from, or denied the benefits of, their school programs in violation of the ADA, federal courts must

examine whether Plaintiffs were denied "meaningful access." Keller, 2021 WL 2411873, at *4. To determine whether Plaintiffs were denied "meaningful access," courts "must look to the regulations that are applicable to Title II—and more specifically to 42 U.S.C. § 12132." S.B., 2021 WL 4755619, at *13 (citing Blum v. Bacon, 457 U.S. 132, 141 (1982)).

Under the ADA's implementing regulations, "[a] public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150. "Section 35.150 'primarily concerns physical, or structural, impediments to public access.'" S.B., 2021 WL 4755619, at *13 n.13 (quoting 28 C.F.R. § 35.150(b)). However, "the invisible barrier that COVID-19 places between [disabled students] and their classrooms [is] necessarily [no] different from a physical barrier that a stairwell places between wheelchair-bound students and their classrooms[.]" Id. "'After all, if [a] child cannot get inside the school,' for whatever the reason, then 'he cannot receive instruction there' and 'he may not achieve the sense of independence conducive to academic (or later to real-world) success.'" Id. (Greer, J.) (citing Fry v. Napoleon Cmty. Schs., 137 S. Ct. 743, 756 (2017)).

ADA implementing regulations also require that a public entity "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of the disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). Relying upon Section 130(b)(7), courts within the Sixth Circuit have found that the ADA requires that a public entity make a reasonable accommodation to students. S.B., 2021 WL 4346232, at *13–15; see also Ability Ctr. of Greater Toledo, 385 F.3d at 907; G.S., 2021 WL 4268285, at *6. Indeed, the school systems here had done so through their temporary universal

mask mandates before Executive Order No. 84 went into effect. (<u>See</u> Doc. No. 37 ¶ 3; <u>see also</u> Doc. No. 80 at 5).

The Governor presents two main arguments as to why Executive Order No. 84 neither excludes nor denies Plaintiffs access to school programs under the ADA or its implementing regulations. First, the Governor argues that Plaintiffs have already been afforded reasonable accommodations. (<u>See</u> Doc. No. 45 at 11). Second, he argues that universal mask mandates are not legally required because masks are scientifically ineffective and would therefore "fundamentally alter" both school programs and the policy rationale behind Executive Order No. 84. (<u>See</u> <u>id.</u> at 12).

### a. *Reasonable Accommodations*

According to the Governor, universal masking is legally unnecessary because Plaintiffs' schools already provide other reasonable accommodations, such as virtual school, enhanced ventilation, and social distancing. (Doc. No. 45 at 11; <u>see also</u> Doc. No. 83 at 2, 6). And unless Executive Order No. 84 precludes each of these alternative accommodations, the Governor argues, "Plaintiffs are not denied meaningful access." (Doc. No. 45 at 11; <u>see also</u> Doc. No. 83 at 2, 6). The Governor also argues that Plaintiffs are entitled only to a "reasonable" accommodation – of which Plaintiffs' schools already provide several – not the "best possible" accommodation. (Doc. No. 45 at 11). In sum, the Governor argues that because Plaintiffs are afforded other accommodations, Plaintiffs cannot identify a program or activity to which they have been excluded because of Executive Order No. 84, especially considering Plaintiffs are currently attending school in person. (Doc. No. 45 at 11; <u>see also</u> Doc. No. 83 at 5).

"'The hallmark of a reasonable accommodation is effectiveness.'" <u>S.B.</u>, 2021 WL 4755619, at *15 (quoting <u>Wright v. N.Y. State Dep't of Corrs.</u>, 831 F.3d 64, 72 (2d Cir. 2016));

see also Keller, 2021 WL 2144873, at *4 (applying Wright in determining whether plaintiff has been excluded from the programs of a public entity in violation of the ADA). Put simply, a reasonable accommodation "need not be 'perfect' [nor] the one 'most strongly preferred' by [plaintiffs]." S.B., 2021 WL 4755619, at *15 (citing Keller, 2021 WL 2411873, at *4). Rather, a reasonable accommodation "must be effective enough to 'adequately address' a disabled individual's 'unique needs.'" Id. (citing EEOC v. Ford Motor Co., 752 F.3d 634, 646 (6th Cir. 2014), vacated en banc on other grounds, 782 F.3d 753 (6th Cir. 2015)). When it comes to COVID-19, there is no silver bullet solution. Instead, it is the constellation of multiple mitigation strategies – masks, social-distancing, and hand hygiene among others – that reduce the virus's life-threatening impact.

This Court agrees that "[a] universal masking requirement instituted by a school is a reasonable modification that would enable disabled students to have equal access to the necessary in-person school programs, services, and activities." ARC of Iowa, 2021 WL 4166728, at *11. Executive Order No. 84 effectively eliminates masking as a tool to mitigate COVID-19. In the challenge to Executive Order No. 84 in the Eastern District of Tennessee, Judge Greer found that:

> [T]he record evidence—i.e., the evidence that infections among school-age children have been meteorically rising since the new school year began in Knox County, that students in Knox County are not wearing masks or practicing social distancing, and that the Knox County Board of Education has no immediate oversight over its own social-distancing policy—leads to only one conclusion: the accommodations currently in place against COVID-19 in Knox County Schools are too hazardously ineffective to address Plaintiffs' unique needs.

S.B., 2021 WL 4755619, at *17. Similarly, here, based on the record currently before the Court, COVID-19 case counts at Plaintiffs' schools remain high. As discussed above, case rates are still at serious levels in Williamson County, as dozens of staff members and more than one hundred students have been in isolation with a confirmed positive case of COVID-19 every week from

26

September 3, 2021 through October 8, 2021. See Williamson County Schools, COVID-19 Numbers 2021-22 (October 8, 2021), https://www.wcs.edu/Page/8641. Indeed, because of rising and current case rates, the Williamson County and Franklin school systems renewed the universal mask mandates instituted in the prior school year to create a safe school environment. (See Doc. No. 37 ¶ 3; see also Doc. Nos. 23, 24, 26, 27, 36, 80 at 5).

Moreover, given the current case rates, other mitigation measures by the Williamson County and Franklin school systems are alone insufficient without a corresponding temporary universal mask mandate. Dr. Cross explained that alternative mitigation measures, such as ventilation and social distancing, are not as effective in curbing the spread of COVID-19 as they would be along with universal masking. (See Hr'g Tr., Doc. No. 77 at 98:21–99:5; 115:4–18; see also Hr'g Ex. 12). R.K.'s mother agreed and also testified that virtual schooling would not be a healthy alternative for her daughter. (Hr'g Tr., Doc. No. 77 at 40:21–24). W.S.'s mother similarly testified that virtual schooling was ineffective for her daughter. (Doc. No. 33 ¶ 3–8). Therefore, the Court finds that the record establishes that the current mitigation measures, without masking, are ineffective at this juncture to curb the spread of COVID-19.

Disabled public school students are excluded from educational programs where they "cannot attend in-person learning at their schools without the very real threat to their lives because of their medical vulnerabilities." ARC of Iowa, 2021 WL 4166728, at *11; see also S.B., 2021 WL 4755619, at *22. This is because public entities must offer educational services that are readily accessible to disabled students. See 28 C.F.R. § 35.150. Public entities must also provide reasonable accommodations to students "where necessary to avoid discrimination on the basis of the disability." 28 C.F.R. § 35.130(b)(7). Governor Lee, Williamson County, and Franklin are public entities for purposes of the ADA. See 42 U.S.C. § 12131(1). And here, the Governor's

27

Executive Order No. 84 turned the Williamson County and Franklin school systems' existing temporary universal mask mandates into a "Swiss cheese model" that weakened their overall COVID-19 mitigation efforts. (Doc. No. 59 at 3 (citing WCBOE hearing on Sept. 20, 2021, available at https://www.youtube.com/watch?v=t3mB3jcxTws (last visited Oct. 15, 2021)); see also Doc. Nos. 80 at 5; 81 at 3–4, 7).

Accordingly, based on the record before the Court, the Williamson County and Franklin school systems appear to be restricted by Executive Order No. 84 from giving Plaintiffs the effective accommodation of a temporary universal mask mandate for all students and teachers. Plaintiffs have therefore shown that Executive Order No. 84 makes "in-person learning at schools available only under conditions that are dangerous to children with disabilities." ARC of Iowa, 2021 WL 4166728, at *11; see also S.B., 2021 WL 4755619, at *22.

### b. The "Fundamentally Alter" Analysis

Alternatively, Governor Lee attempts to sidestep the ADA's "reasonable accommodation" requirement by arguing against the effectiveness of mask mandates in schools. (Doc. No. 45 at 12; see also Doc. No. 83 at 8–9). Section 130(b)(7) provides an exception to making reasonable accommodations where a public entity can "'can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.'" Waskul v. Washtenaw Cty. Cmty. Mental Health, 979 F.3d 426, 463 (6th Cir. 2020) (quoting 28 C.F.R. § 35.130(b)(7)). Here, the Governor argues that a universal mask mandate would "'fundamentally alter' the policy choice set forth in [Executive Order No. 84] and is by definition not reasonable." (Doc. No. 45 at 12). Specifically, Governor Lee argues that scientific studies do not support the "efficacy of universal mask mandates in schools." (Id.; see also Doc. No. 83 at 8–9).

28

As an initial matter, the Court is simply not in a position to usurp the Williamson County and Franklin school systems' authority to implement mask mandates. Indeed, the Tennessee legislature has explicitly vested local school boards with the authority to "[m]anage and control all public schools established or that may be established under its jurisdiction." Tenn. Code Ann. § 49-2-203(a)(2). Here, recognizing that their schools were reaching a "crisis point" due to the rapid spread of new COVID-19 infections, both the Williamson County and Franklin school systems implemented temporary universal mask mandates for all students, staff, and visitors, except for those who have a medical condition or sincerely held religious belief. (See Doc. Nos. 1-1, 23, 24, 26, 27). The schools relied upon objective, science-based factors to impose the mask mandates, which were identical to those effectively imposed earlier in the pandemic. (See Doc. No. 37 ¶ 3 (noting that Williamson County schools imposed mask mandates during the 2020-2021 school year); see also Doc. Nos. 1-1, 23, 24, 26, 27, 80, 81; Franklin Special School District, Messages from the Director (August 20, 2021), https://www.fssd.org/about-us/fssd-together-2021#fs-panel-13348 (discussing objective measures upon which the school board relied)).

In short, the Williamson County and Franklin school systems are in the best position to impose mitigation measures for the schools within their respective jurisdictions. See Tenn. Code Ann. § 49-2-203(a)(2). This includes temporary universal mask mandates, and the Court declines to disturb the schools' careful judgment in this regard. See Dahl v. Bd. of Trustees of Western Mich. Univ., No. 21-2945, __ F. 4th __, 2021 WL 4618519, at *6 (6th Cir. Oct. 7, 2021) (finding that a public educational institution "may still require plaintiffs to wear masks" because of its ameliorative effect on the spread of COVID-19).

Further, as explained above, the persuasive and credible evidence before the Court establishes the importance of masks as a safe and effective tool to fight the deadly COVID-19

pandemic. There is no persuasive or credible evidence that universal masking would fundamentally alter school programs. The proper inquiry here is whether the existing reasonable accommodations are effective without masking. See S.B., 2021 WL 4755619, at *22. In this Court's judgment, they are not. The record establishes that current accommodations are ineffective. Plaintiffs have established that they were excluded from Williamson County's and Franklin's services, programs, and activities "when viewed in [their] entirety, [are not] readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.130.

### 2. Requisite Discrimination Under the ADA

Plaintiffs must next establish that they were excluded from their schools' programs *because* of their disability. See 42 U.S.C. § 12132 (emphasis added). Governor Lee argues that Plaintiffs cannot establish such discrimination under a failure to accommodate theory because they cannot show "animus against the protected group was a significant factor in the position taken by [the decisionmakers]." (Doc. No. 9–10 (citing Anderson v. City of Blue Ash, 798 F.3d 338, 357 (6th Cir. 2015))). Specifically, the Governor argues that Executive Order No. 84 was motivated not by animus but by a reasonable decision "to allow parents to decide what is best for their children." (Doc. No. 45 at 10).

The Governor's argument is not supported by well-established legal precedent. Under the ADA, Plaintiffs may bring discrimination claims under a failure to accommodate theory. See S.B., 2021 WL 4755619, at *12–13 (citing McPherson v. Michigan High School Athletic Ass'n, Inc., 119 F.3d 453, 460 (6th Cir. 1997)). And Plaintiffs may support failure to accommodate claims through evidence of unintentional, rather than intentional, discrimination. Id. (citing Ability Ctr. of Greater Toledo, 385 F.3d at 908–09). Here, Plaintiffs argue that in-person learning is neither safe nor readily accessible to them because of Executive Order No. 84. (See Doc. No. 4-1 at 10–

11; see also Doc. Nos. 1-1, 4-3, 4-4, 4-5, 4-6). Specifically, Plaintiffs argue that Governor Lee's order discriminates against them by reason of their disability, forcing them to face a prevalent threat of infection every time they access public educational programs and services. (Doc. No. 4-1 at 11–12; see also Doc. Nos. 1-1, 4-5, 4-6).

The credible evidence supports Plaintiffs' claims. The application of Executive Order No. 84 operates to discriminate against Plaintiffs and other disabled students. For example, R.K.'s mother reiterated her testimony that her daughter's Down syndrome means she is "four times more likely to be hospitalized and ten times more likely to die as a result of [COVID-19] as compared with the general population." (Doc. No. 4-3 ¶ 3; see also Hr'g Tr., Doc. No. 77 49:13–51:7; Hr'g Ex. 3). Dr. Cross agreed, noting that Plaintiffs' conditions place them "at risk of contracting COVID-19" with greater severity. (Doc. No. 77 90:10–20). Plaintiffs have therefore established that, because of Executive Order No. 84, they have been excluded from full and active participation in their schools' programs "by reason of" their disabilities. 42 U.S.C. § 12132.

3. Exhaustion

Governor Lee also maintains that Plaintiffs have failed to exhaust their administrative remedies as required under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq. (See Doc. No. 83 at 2, 11). Specifically, the Governor argues that Plaintiffs' parents have failed to discuss potential accommodations with their respective children's Individualized Education Program ("IEP") or Section 504 teams, as required by the IDEA. (Id.).

But the Governor's exhaustion argument is no more persuasive now than it was when the Court rejected it upon issuing temporary injunctive relief. (See Doc. No. 30 at 13–14). The Governor is correct that, under the IDEA, "an 'individualized education program,' called IEP for short, serves as the 'primary vehicle' for providing each child with" the "free and appropriate

31

public education" ("FAPE") required under the Act. <u>ARC of Iowa</u>, 2021 WL 4166728, at \*7 (citing <u>Fry v. Napoleon Cmty. Schs.</u>, 580 U.S. __, 137 S. Ct. 743, 749, 197 L.Ed.2d 46 (2017)); <u>see also</u> <u>S.B.</u>, 2021 WL 4755619, at \*6 (finding that the Governor, relying on the same argument, "does not convince the Court that the IDEA's exhaustion requirement applies"). However, as the Court has already found, the IDEA is inapplicable to this case. The IDEA is simply not meant to "limit the rights, procedures, and remedies available under" the ADA or Section 504. <u>S.B.</u>, 2021 WL 4755619, at \*6 (citing <u>Fry</u>, 137 S. Ct. at 756). Indeed, if "the remedy sought [by Plaintiffs] is not for the denial of a FAPE, then exhaustion of the IDEA's procedures is not required." <u>Id.</u> (citing <u>Fry</u>, 137 S. Ct. at 754).

In this case, Plaintiffs' remedy is not for the denial of a FAPE. Rather, as discussed above, Plaintiffs seek relief from the educational harm caused by Executive Order No. 84 itself. (<u>See</u> Doc. No. 4-1 at 10–11). Rejecting the same argument by the Governor, Judge Lipman similarly concluded that the IDEA exhaustion requirement was inapplicable because Plaintiffs sought relief from the harm caused by Executive Order No. 84 in preventing access to educational programs. <u>G.S.</u>, 2021 WL 4268285, at \*10–12. Here, the Governor has not presented any evidence that would make the Court disagree with this sound approach. Governor Lee's order restricts the protections that would otherwise be afforded by the Williamson County and Franklin school systems' temporary universal mandatory mask mandates. (<u>See</u> Doc. No. 4 at 1; <u>see also</u> Doc. No. 4-1 at 10–11). Plaintiffs' claims therefore lie outside of the ambit of the IDEA. <u>See</u> <u>S.B.</u>, 2021 WL 4755619, at \*6–7. Accordingly, the Court rejects Governor Lee's exhaustion arguments.

For the foregoing reasons, and based on all the evidence before the Court, Plaintiffs have established a likelihood of success on the merits of their failure to accommodate claim and are entitled to the anti-discrimination protections in the ADA and Section 504.

32

C. Irreparable Harm

Having established a likelihood of success on the merits, Plaintiffs must next establish that they are likely to face irreparable harm absent an injunction. Vitolo, 999 F.3d at 360 (citing Nken, 556 U.S. at 434). Because the Court has already found that Plaintiffs preliminarily established irreparable harm when issuing temporary injunctive relief, Plaintiffs must now show that such harm would continue absent an injunction. (See Doc. No. 30 at 15–16).

Here, Plaintiffs have established that, were Executive Order No. 84 to remain in effect, they would continue to be subject to irreparable harm because they would remain at an increased exposure to severe illness—and possibly death—merely by accessing educational opportunities in their respective school buildings. (Doc. No. 4-1 at 12–13; see also Doc. No. 82 at 9). The record before the Court establishes that, due to the continuing COVID-19 case count in Williamson County, including at Plaintiffs' schools, along with the significant number of students who had opted out pursuant to Governor Lee's Executive Order, Plaintiffs have been denied access to a safe, in-person educational experience. (See Doc. No. 1 ¶¶ 56–78; see also Doc. No. 4-1 at 12–13). As R.K.'s mother testified, her "daughter is at higher risk to be one of those 13 real individual human children" who died in Tennessee in August. (Doc. No. 77 at 65:6–10). This risk, she says, is "too much for [her] family." (Id. at 65:12).

Similarly, W.S.'s mother remains "concerned that [W.S.] may be reinfected if [the Franklin school system] does not universally require masks for all students and teachers." (Doc. No. 4-4 ¶ 10; see also Doc. No. 70-1 at 32:7–13). And according to Dr. Cross, "the failure to implement a universal masking policy in schools will likely lead to extremely high rates of transmission of COVID-19." (Doc. No. 4-5 ¶ 20). In short, disabled students are at a significantly higher risk for

severe infection and are exposed at a higher rate following Executive Order No. 84 is, by itself, an irreparable harm that justifies continued injunctive relief. (See Doc. No. 4-6 ¶¶ 13, 19).

This finding is consistent with the Western and Eastern Districts of Tennessee decisions on irreparable harm. In the Western District, Judge Lipman concluded that because plaintiffs pled that "school has been in session for more than 3 weeks, a significant number of the student body has already opted-out of the county-wide mask mandate, and the number of students infected with COVID-19 or exposed, warranting quarantine continues to rise," plaintiffs were "denied the benefits of an in-person public education." G.S., 2021 WL 4268285, at *12. And in the Eastern District, Judge Greer concluded that disabled students were being irreparably harmed because of the lack of a universal mask mandate. S.B., 2021 WL 4755619, at *23–26. The same remains true in Williamson County.

Accordingly, the Court finds that Plaintiffs face irreparable harm to justify immediate injunctive relief, and that this factor weighs in their favor.

D. Harm to Others and the Public Interest

The Court must finally balance any harm with the public interest. Nken v. Holder, 556 U.S. 418, 435 (2009) (noting that when the government opposes injunctive relief, the third and fourth elements for a preliminary injunction merge); see also S.B., 2021 WL 4755619, at *27; G.S., 2021 WL 4268285, at *12–13; ARC of Iowa, 2021 WL 4166728, at *12. The Governor maintains the same argument as the one the Court already rejected when issuing a temporary injunction: that the public interest weighs against an injunction because "[g]ranting an injunction subverts the democratic process" and improperly interferes with the "individualized choice of thousands of parents in Williamson County." (Doc. No. 16 at 16–17). Plaintiffs respond that there would be no harm suffered by the Governor because the public is benefitted by: (1) enforcement of the ADA;

34

(2) protection of public health; (3) a reduced risk and spread of COVID-19 among schools; and (4) reduced strain on hospital resources for those requiring care. (Doc. No. 4-1 at 14). The Court agrees.

As discussed above, the elected Williamson County and Franklin school systems have statutory authority to impose temporary universal mask mandates to protect their constituencies and to support public health. (See Doc. Nos. 1-1, 23, 24, 26, 27); see also Tenn. Code Ann. § 49-2-203(a)(2) (providing the authority for schools to "[m]anage and control all public schools established or that may be established under its jurisdiction"). Public health is certainly in the public interest. See G.S., 2021 WL 4268285, at *13 (citing Neinast v. Bd. of Trs. of the Columbus Metro. Library, 346 F.3d 585, 594 (6th Cir. 2003)). As the Court previously found, the public interest also favors injunctive relief because it is "served by the enforcement of the ADA." Wilborn ex rel. Wilborn v. Marin, 965 F. Supp. 2d 834, 848 (M.D. Tenn. 2013); see also Hostettler v. Coll. of Wooster, 895 F.3d 844, 853 (6th Cir. 2018).

In sum, the record before the Court establishes that temporary universal mask mandates adopted by the Williamson County and Franklin school systems have been, and likely would continue to be, effective in curbing the spread of COVID-19. (Doc. Nos. 1-1, 4-5 ¶ 12, 4-6 ¶ 20, 23, 24, 26, 27). Importantly, neither the Williamson County nor Franklin school system opposes the continued issuance of injunctive relief, as doing so would "be entirely consistent with the policy adopted by" the schools. (Doc. No. 81 at 3; see also Doc. No. 80 at 5).[9] Accordingly, the Court finds that the public interest favors continued injunctive relief.

---

[9] The Court recognizes that the Williamson County and Franklin school systems object to an indefinite universal mask mandate that would preclude them from amending current mitigation efforts or imposing new ones as the COVID-19 pandemic ebbs and flows. (See Doc. Nos. 34 at 9, 35 at 4, 80 at 4–5, 81 at 3–4). The Court clarifies that nothing in this opinion is meant to inhibit a

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs have established that they are entitled to a preliminary injunction against Governor Lee's Executive Order No. 84 under Federal Rule of Civil Procedure 65. See Fed. R. Civ. P. 65. Executive Order No. 84 violates federal law and must yield. Accordingly, Plaintiffs' Motion for a Preliminary Injunction (Doc. No. 4) will be granted.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

---

school's authority, under Tennessee law, to impose or amend appropriate mitigation measures, including temporary universal mask mandates. See Tenn. Code Ann. § 49-2-203(a)(2).

36